278

RAYMOND AARON RANDOLPH *v.* STATE OF
MARYLAND

[No. 358, September Term, 1971.]

*Decided February 3, 1972.*

The cause was submitted on briefs to MURPHY, C. J.,
and MORTON and MOYLAN, JJ.

Submitted by *A. Gordon Boone, Jr.,* for appellant.

Submitted by *Francis B. Burch, Attorney General,
David H. Feldman, Assistant Attorney General,* and *Naji*

*Maloof, Special State's Attorney for Calvert County,* for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellant, Raymond Aaron Randolph, takes umbrage at his conviction as a Rogue and Vagabond by Judge Perry G. Bowen, Jr., sitting without a jury, in the Circuit Court for Calvert County. He challenges the legal sufficiency of the evidence against him and, in so doing, again raises the specter of *Crossland v. State,* 252 Md. 70. Again, it, on its unique facts, is distinguishable.

Judge Bowen found, appropriately from the evidence, that a breaking was attempted and partially completed at the Calvert Esso Station on Route 260 in rural Calvert County at approximately 3:30 a.m. on October 28, 1970. The operator of that service station, who lived in a trailer behind it, telephoned the State Police and told them that "a burglary was in progress." Within minutes, Trooper Thomas H. Ireland was on the scene.

As he approached the service station, he observed a 1965 Oldsmobile parked on the shoulder of the road some 25 feet from the station. Trooper Ireland observed the door of the third bay of the garage was open and that a tool box was sitting on the ground outside of that opened door. The door in question had been previously broken and had been covered with a piece of sheet metal. When Trooper Ireland inspected it, he found that the sheet metal had been pushed away from the door and that the door opened approximately eighteen inches from the bottom. At the moment when Trooper Ireland approached the station, an unidentified individual, not the appellant here, was observed to flee from the rear of the building.

After making his quick survey of the service station itself, Trooper Ireland approached the automobile which was parked 25 feet away. He found the appellant sitting on the passenger's side of the front seat, ostensibly asleep. The trooper obtained the appellant's full and voluntary consent to search the automobile. He found therein a pair

of bolt cutters and a pair of leather gloves under the driver's side of the front seat. He also found a bag of miscellaneous hand tools under the passenger's side of the front seat. They included one set of socket wrenches, two screwdrivers, a tack puller, a pair of cutting pliers, a pair of lock pliers and a pair of regular pliers. The automobile was owned by the appellant.

A more thorough survey of the scene at the partially-opened door of the service station revealed that a number of automobile tires and an air impact tool, of a total value in excess of $500, had been removed from the station and placed alongside of it.

Judge Bowen, as was his fact-finding prerogative, chose to disbelieve in its entirety the explanation of the appellant that all of the tools found in his automobile actually belonged to a mysterious passenger named "Jake," who had earlier that night persuaded the appellant to drive him from Baltimore to Annapolis, had shared a bottle of whiskey with the appellant, had taken over the driving of the car when the appellant became drowsy, and had somehow disappeared into the night after driving the appellant, unawares, into rural Calvert County.

We cannot say that Judge Bowen was clearly wrong in finding that a breaking and entering of the service station with intent to steal goods of the value of $100 or upwards was in progress, by the appellant alone or by the appellant along with another, and that the crime was aborted in midpassage by the timely arrival of Trooper Ireland.

Article 27, Section 490, proscribes, *inter alia,* the possession of "any picklock, key, crow, jack, bit, or other implement, at places and under circumstances from which an intent may be presumed feloniously to break and enter into any . . . storehouse." See *Downes v. State,* 11 Md. App. 443. Having found a felonious breaking and entering to have been in progress, the judge further found that the various tools and implements recovered from the immediate presence of the appellant in the front

seat of the appellant's automobile were singularly well adapted for the breaking and entering which was being perpetrated at that very time and place.

Judge Bowen's disquisition on the ordnance of the burglar is classic:

> "Now let us turn to the tools that are involved in this case. Only very rarely does a burglar or a housebreaker employ a set of custom-made burglary tools. Most burglars, housebreakers and persons interested in getting into other people's property simply adapt for their purposes tools which are ordinarily put to legal use and which are readily available and obtainable in the hardware store or from any tool supplier.

> If one went out to equip himself to go into the burglary or housebreaking business, he would need, one would assume, something capable of removing screws, because a great many hasps and locks and hinges on the exterior of buildings are put on with screws. The best implement for removing those is a screw driver. Now screws come with two kinds of heads, standard heads and Phillip heads, so you would certainly want a screw driver with each of those heads. These people had both screw drivers, the Phillip head screw driver about eight inches long and a screw driver with a standard head, of a make which I have never before seen. It has an adjustable split head and shaft, a very neat fine work on any size screw, it can be adjusted from something less than $\frac{3}{8}''$ up to something over $\frac{1}{2}''$, simply by pressing the rod and adjustable sleeve on the shaft of the screw driver up or down.

> Now, in addition to screws, some hasps, hinges and locks are put on with bolts and these bolts and these nuts are capable of being un-

screwed. So you need a wrench of some sort or another. This assortment of tools contains a set of wrenches which are capable of being used on nuts ranging in size from $\frac{3}{8}''$ to $\frac{3}{4}''$ in increments of a sixteenth. These obviously are useful tools for a burglar. They come in a compact package susceptible of being slipped into a fair-sized pocket or carried in a coat pocket or an overcoat pocket. They make a small and easily portable package and include a ratchet, which means that you can quickly remove a bolt once it is loosened and break a bar loose for a tough nut and an extension for reaching difficult ones.

In addition to that, this assortment ought to contain something which is capable of cutting the small rods out of which heavy screen sometimes found on store house windows [is made] —which is something less than the bars you find on a prison or jail, but yet, something more than you find on fire screen too. Generally, [it is] made out of very heavy wire rods woven together, such as everyone has seen from time to time on store house windows. [They] would want some implement capable of getting through that. Now there are two sorts of implements adapted for that purpose, files and cutters. The file is a slow and noisy sort of implement and while there are some jobs in which it is best, the modern house breaker and burglar, we think, leans towards bolt cutters. Now these are really cutting pliers of a particular construction capable of exerting tremendous cutting pressure on small metal rods or bolts. With these, in a matter of a second, one can cut off a bolt or a piece of metal rod quietly and cleanly up to $\frac{3}{8}$ inch in diameter—$\frac{3}{8}$ inch bolt is a right substantial piece of metal—cut off in a single snip and a great many buildings wouldn't possess any larger rod in its screen, perhaps with the excep-

tion of prisons, penitentiaries and buildings which, like banks, go in for maximum security. These cutters are inclined to turn up or cutters of similar make and fashion. They can be readily carried. They do constitute more of a burden than a file would, but they are portable and can be carried along with the other tools here in a small roll, a relatively small package. Unlike the file, they have the advantage of being both quick and quiet.

While we are on the cutting aspect of it, for the purpose of cutting nails, tack heads and light screen, you might want a smaller and a quicker moving plier of some kind. This group of tools includes a pair of cutting pliers, commonly referred to among mechanics and electricians as side cutters. They are most often used in stripping electrical wires, or cutting through the insulation of the wire and not all the way through; but they are adaptable to burglary use in the same way as the bolt cutters are.

Finally, one would want some sort of narrow instrument that could be slipped into cracks or used as a pry. Burglars and house breakers, from my experience, generally favor implements with slender bits ranging all the way from large screw drivers and small tack pullers up to fair-sized crowbars, depending upon the operation they are handling. These people may have had the remainder but, representative of that class in these tools, I find only this small crowfoot nail and tack puller. It is a small crowbar with a wooden handle built very much like a screw driver with a bent bit split in the middle for pulling nails or for holding other things or simply for exerting more pressure in grip than is possible with the hands.

We have here two implements of the gripping

or pinching type, a set of ordinary pliers which will serve to do ordinary small jobs and a set of very substantial locking or vice-grip pliers capable of acting as an adjustable wrench for turning nuts or for gripping and pulling with considerable force any staple, nail, plug or hasp that resists being moved.

Now when you examine all these tools together and in relationship to each other, it seems to me that they are singularly adapted to the purposes of house breaking or burglary. Admittedly they are the type of tools which one can find in a great many different places—households, shops, hardware stores, garages. As a matter of fact, with the exception of bolt cutters, you can find everything laying on this counter, except that they are more elaborate and in greater numbers, in the back of my station wagon parked out in front of the Court House. The reason I don't carry my bolt cutters is that I am afraid somebody will steal them and they cost right much money. They are the most expensive item in this whole get-up. Somebody might say, 'Well, if they find you there with all these things, you might convict yourself of house breaking or being a rogue and vagabond' and the answer is, 'I know I will not, because I am not hanging around somebody's station that has just been burglarized at 3:00 in the morning. . .'

. . .Now one isn't surprised that there were no finger prints, because the express purpose of these gloves in the house breaking and burglary trade is to prevent the leaving of tell-tail identification by finger prints on the items left behind."

The appellant drops back upon a second defensive position and urges that, even if he be deemed to have

been involved in the breaking and entering and even if the potentially burglarious tools be deemed to have been his own, the breaking and entering was already a *fait accompli* upon the arrival of Trooper Ireland at the scene and any finding as to him of roguery and vagabondage would be, therefore, precluded under *Crossland.* The appellant reads *Crossland* overbroadly.

The unusual factual posture of that case was that not simply the breaking and entering of a dwelling house had been consummated, but the larceny which was the object of that breaking and entering had been consummated, as well, and the defendant there was already walking away from the scene of his earlier crimes when he was first observed. In pointing out that the possession of burglarious implements must correspond in time with the intent to commit the crime for which the tools are to be mechanical aids, the Court of Appeals used the language, at 73-74:

> "We believe that the normal usage of this language implies the mental processes preliminary to the actual doing of or completion of a particular act. Thus Black's Law Dictionary 992 (3rd Ed. 1933) defines 'intent' (in criminal law) as 'Purpose; formulated design; *a resolve to do or forbear a particular act; aim;* determination. In its literal sense, the stretching of the mind or will *towards* a particular object.' (Emphasis supplied.) We believe that it is manifest that one cannot formulate 'a resolve to do or forbear [doing]' something which is already done, nor can one 'aim' or move 'towards' an end that is already accomplished. In addition, the beneficial and useful purpose of this important statutory provision, first passed by the General Assembly by The Acts of 1809, Chapter 138, Part VII, Section 4 is to give the enforcement officers a tool to apprehend and suppress more aggravated criminal conduct *prior* to its actual commission."

In *Downes v. State, supra,* we discussed the applicability of the *Crossland* doctrine to situations similar to the one at bar, at 446-447:

"The unusual facts and circumstances in *Crossland* were that the taking of goods by Crossland and their asportation were clearly established. So larceny was not only shown to have been the reason for breaking and entering of the dwelling house and the reason for his being in or upon the dwelling house, but the larceny was shown to have been completed. Therefore, although Crossland possessed an implement contemplated by [that portion of Section 490 which concerns us in the instant case] it could not be presumed that he had an intent feloniously to break and enter the dwelling . . . This was so because the larceny was then a *fait accompli;* the possession of the implement could not show an intent to break and enter a dwelling to do an act he had already done, and his being seen walking out of the house carrying the stolen goods could not support a rational inference that he then had an intent to steal what he had already stolen and carried away. Thus the *Crossland* holding would not be applicable unless . . . the felonious act which was the intent of the breaking and entering had been consummated, the mere completion of the breaking and entering itself not being sufficient to invoke it; . . ."

See also *Knight v. State,* 7 Md. App. 282, 286, wherein we held that the evidence was sufficient to sustain a conviction for being a rogue and vagabond where the storehouse breaking was completed, but the larceny was not.

The evidence in this case showed clearly that the asportation had not been completed. It permitted a reasonable inference that even the entering phase of the criminal activity had not been completed, further entries

to make off with more goods being a distinctly feasible possibility. From the available facts, one could not even foreclose the possibility of a further or wider breach.

Although a criminal intent cannot be brought forward from the past to correspond with present possession, that criminal intent nonetheless continues and prevails not only while the intended act is *in futuro* but also while it is *in praesenti*.

*Judgment affirmed.*